## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

Joseph Rutledge,

       Plaintiff,

       v.

City of Chicago, *et al.*,

       Defendants.

Case No. 13 C 870

Judge John Robert Blakey

## <u>MEMORANDUM OPINION AND ORDER</u>

This is a Section 1983 action that arises from the December 2012 inspections of Plaintiff Joseph Rutledge's home by City of Chicago inspectors. Plaintiff brings two constitutional claims alleging: (1) that Defendants Vallie Smith and Donald Kerksick (City of Chicago inspectors who inspected Plaintiff's home) violated his right to be free from unreasonable searches under the Fourth Amendment; and (2) that Defendant City of Chicago violated the Equal Protection Clause by targeting Plaintiff's home for inspection due to his race. Defendants now move for summary judgment [84] on both claims. That motion is granted.

## I.    Legal Standard

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party, here, Plaintiff. *See CTL ex. rel. Trebatoski v. Ashland School District*, 743 F.3d 524, 528 (7th Cir. 2014).

## II.    Facts[1]

### A.    Parties

Plaintiff owns a single-family home on South Damen Avenue in the City of Chicago ("Damen Residence"), and has lived there since 2005. DSOF ¶ 1; Rutledge Dep. at 5-6. Beginning in 2005, Plaintiff has split his time between the Damen Residence and his mother's nearby home. DSOF ¶ 7; Rutledge Dep. at 40-41, 45. Plaintiff is an African-American male. Rutledge Dep. at 139.

Since approximately 2009, Plaintiff has lived, at times, with Yolanda Lasley (whose race is unidentified) at the Damen Residence. DSOF ¶ 8; Lasley Dep. at 11, 47-48; Rutledge Dep. at 49. Plaintiff first met Lasley in 1990 or 1991, and the two

---

[1] The facts are taken from the parties' Local Rule 56.1 statements. "DSOF" refers to Defendants' statement of undisputed facts [86], with Plaintiff's responses where applicable [90]. While Plaintiff has not submitted a responsive Local Rule 56.1 statement of facts, he has made certain factual allegations with citations to the record in his response brief [90]. This Court refers to these factual allegations as "PSOAF." Despite this technical failure to comply with Local Rule 56.1, this Court nonetheless considers those facts to give Plaintiff the benefit of the doubt as the nonmoving party at summary judgment. Fed. R. Civ. P. 56(e); *see Steve v. Frasor*, 662 F.3d 880, 886-87 (7th Cir. 2011) (recognizing that it is within this Court's discretion to apply Local Rule 56.1 strictly). This Court, of course, does not consider factual allegations not supported by the record. *Schneiker v. Fortis Insurance Co.*, 200 F.3d 1055, 1057 (7th Cir. 2000).

began a romantic relationship that has continued off-and-on ever since. DSOF ¶ 16; Lasley Dep. at 9-10.

In December 2012 (and at other times not relevant here), Lasley lived at the Damen Residence full-time. DSOF ¶ 9. In December 2012 (and at other times as well), Lasley had a key to the Damen Residence, kept her clothes there, had friends and relatives regularly visit her at the home, contributed to household expenses and had full access to all the rooms in the home. DSOF ¶¶ 10-14.

Defendants are the City of Chicago and two City building inspectors, Donald Kerksick and Vallie Smith. DSOF ¶¶ 3-4. Inspector Smith and Inspector Kerksick inspected the Damen Residence on December 3 and 6, 2012, respectively. PSOAF ¶¶ 19, 46 (citing 12/3/12 Inspection Report [86-4] at 0044; and 12/6/12 Inspection Report [86-5] at 0007).

### B. Inspections of the Damen Residence

There were at least four inspections of the Damen Residence between December 3 and 7, 2012. DSOF ¶¶ 19, 34, 41, 44. It is undisputed that Inspector Smith and Inspector Kerksick completed two of the inspections, but the parties do not clarify who completed the other inspections. This Court addresses each inspection in chronological order.

### 1. December 3, 2012: Inspector Smith

On December 3, 2012, in response to a 3-1-1 call, Inspector Smith arrived at the Damen Residence and knocked on the door. DSOF ¶ 19; 12/3/12 Report [86-4] at 0044. 3-1-1 is the City of Chicago's phone number for residents to call to access

non-emergency municipal services, including, as here, fixing broken windows in residences. Lasley Dep. at 13, 23-24. While there is conflicting evidence in the record whether Lasley called 3-1-1 to report a broken window in a neighbor's home or whether a neighbor called about the Damen Residence, *compare* Lasley Dep. at 13, *with* 12/6/12 Inspection Report [86-4] at 0044, that factual dispute is immaterial in this case.

Lasley answered Inspector Smith's knock on the door. DSOF ¶ 19. Plaintiff was not home at that time. DSOF ¶ 28. Before letting Inspector Smith into the Damen Residence and while Inspector Smith was waiting at the door, Lasley said she lived at the Damen Residence. DSOF ¶¶ 21-22. Inspector Smith, while waiting at the door, informed Lasley that she was responding to the 3-1-1 call. Lasley Dep. at 17. Specifically, Lasley testified that Inspector Smith, referring to the broken window at the Damen Residence, said she "was answering a call about the windows." Lasley Dep. at 17. Inspector Smith, according to Lasley, did not identify herself as a City of Chicago inspector. DSOF ¶ 20; Lasley Dep. at 18. Lasley responded that just one window at the Damen Residence was boarded off, and Lasley allowed Inspector Smith inside to see for herself that the window was fixed. DSOF ¶ 20; Lasley Dep. at 13. It is undisputed that Lasley was not under the influence of drugs or alcohol during this or the subsequent inspections during December 2012. DSOF ¶ 18; Lasley Dep. at 13, 64.

Once inside the Damen Residence, Inspector Smith inspected the boarded-up side window by the door. DSOF ¶¶ 22-23; Lasley Dep. at 13. Lasley testified that

she and Inspector Smith discussed the window, with Lasley explaining that the window had been fixed. According to Lasley, the conversation went as follows:

> She [Inspector Smith] told me she wanted to see was my window actually fixed, because the board was still up there. And I told her it was fixed. You know what I'm saying? I really wanted to ask why I had to prove it to her, but I went and let the lady come on in and see the window was fixed.

Lasley Dep. at 19.

Inspector Smith then asked for permission to use the bathroom, which was in the basement. DSOF ¶ 23. While Inspector Smith was in the basement, the furnace cut off. DSOF ¶ 24; Lasley Dep. at 14. After returning upstairs, Inspector Smith asked Lasley what was wrong with the furnace. DSOF ¶ 25. Lasley responded that the furnace cut off periodically. Lasley Dep. at 14. Inspector Smith informed Lasley about various City assistance programs that help residents fix household problems, including one that offers new furnaces. DSOF ¶ 25; Lasley Dep. at 15, 22. Lasley understood Inspector Smith to be referring to a so-called "CEDA program," which, according to Lasley, offers free furnaces. Lasley Dep. at 22, 38. Inspector Smith further told Lasley that she would send "a man" to the Damen Residence to look at the furnace. DSOF ¶ 33; Lasley Dep. at 15. Sometime thereafter, Lasley asked Inspector Smith to leave the home, and Inspector Smith left promptly. DSOF ¶ 27; Lasley Dep. at 37-38. It is undisputed that during the duration of Inspector Smith's inspection, Lasley did not discuss Plaintiff or Plaintiff's race. DSOF ¶ 50; Lasley Dep. at 26.

The parties dispute how long Inspector Smith remained at the Damen Residence. Defendants cite Lasley's deposition testimony that Smith was in the house for seven or eight minutes. DSOF ¶ 26 (citing Lasley Dep. at 31-32). Plaintiff infers—but cites no specific supporting evidence—that the inspection of the window and furnace and the visit to the bathroom had to have taken longer than seven or eight minutes. PSOAF ¶¶ 26, 29-30.

Later on December 3, 2012, Inspector Smith recorded 11 violations of the Chicago Building Code in an Inspection Report dated December 3, 2012. 12/3/12 Inspection Report [86-4] at 0044-45. Seven of the violations regarded conditions in the interior of the Damen Residence; the other four violations were for exterior conditions. DSOF ¶ 29. The conditions included broken window panes, missing smoke and carbon monoxide detectors, cockroaches and a broken exterior doorknob. DSOF ¶ 29.

## 2. December 4, 2012: Furnace Inspection

On December 4, 2012, the day after Inspector Smith's inspection, a second inspector came to the Damen Residence. Lasley Dep. at 38-40. Again, Plaintiff was not at home. DSOF ¶ 37. This inspector's name is unknown. DSOF ¶ 38. Lasley only recalled a description of the second inspector: the inspector was African American, male, 5 feet 10 inches tall with some hair on his face, "kind of medium complexion" and "kind of chubby, but not real chubby." DSOF ¶ 38; Lasley Dep. at 39. Lasley further testified that the inspector was wearing "regular clothes," meaning "jeans, shirt, jacket." Lasley Dep. at 39.

Lasley did not ask this second inspector for identification, but nonetheless let him into the home believing that he was the "man" sent by Inspector Smith to look at the furnace. DSOF ¶¶ 35, 39. Lasley took the inspector to the basement to inspect the furnace and purportedly gave him $19 for "a piece for the furnace to make it stop from cutting all that off." DSOF ¶ 36; Lasley Dep. at 38, 40-41. Lasley testified that this second inspector never returned with the $19 furnace piece. Lasley Dep. at 39. Once again, Lasley did not discuss Plaintiff or Plaintiff's race with this inspector. DSOF ¶¶ 50-51.

### 3. December 6, 2012: Inspector Kerksick

On December 6, 2012, Inspector Kerksick went to the Damen Residence to inspect the furnace. DSOF ¶ 46; Lasley Dep. at 45. In her deposition, Lasley claimed that she "had to" let Inspector Kerksick into the Damen Residence "to show them everything on that paper to make sure it was approved." Lasley Dep. at 45.

After conducting the inspection on December 6, 2012, Inspector Kerksick recorded three violations of the Chicago Building Code in an Inspection Report. 12/6/12 Inspection Report [86-5] at 0007, 0058. Kerksick identified the violations as the following: (1) a furnace out of service at the time of inspection; (2) a cooking stove being used as a heating device; and (3) no working carbon monoxide detectors. 12/6/12 Inspection Report [86-5] at 0058. Inspector Kerksick also wrote that the furnace "hasn't worked all year." 12/6/12 Inspection Report [86-5] at 0058. Finally, Kerksick noted that "a well-being check" should be done on the individual renting the house. 12/6/12 Inspection Report [86-5] at 0058.

The parties also describe an inspection by an unidentified man that occurred within a week of Inspector Smith's December 3, 2012 inspection. Lasley Dep. at 46. This appears to refer to Inspector Kerksick's December 6, 2012 inspection. According to Lasley, an African American male inspector came to the Damen Residence to follow-up on the housing violations found by Inspector Smith. DSOF ¶ 41. Lasley let the inspector inside the Damen Residence. DSOF ¶ 42. This inspector looked at all three doors in the home, the walls and the drawers. Lasley Dep. at 45, 54-56. Lasley allowed the inspector to look inside the drawers to confirm that there were no cockroaches hiding there. DSOF ¶ 43. While the record does not show whether Inspector Kerksick conducted this inspection or not, the record confirms that Lasley consented in either event. DSOF ¶ 42; Lasley Dep. at 45.

### 4. On or After December 7, 2012: Exterior Inspection

According to Lasley, following the inspection by the unidentified male (who may have been Inspector Kerksick), a fourth inspector purportedly came to the Damen Residence to follow up on certain exterior violations at the home and found that all the violations had been fixed. DSOF ¶ 44; Lasley Dep. at 43, 45-46. Even though references to such visits are made in Lasley's deposition testimony, neither inspection is contained in the factual record supplied to this Court. Lasley Dep. at 38-40, 43, 45-46. Nevertheless, Lasley apparently testified that this inspector "looked at all the stairs and the back doors and, you know, windows, everything. He

circled the outside of the house." DSOF ¶ 44; Lasley Dep. 45-46, 54-55. The fourth inspector, according to Lasley, never entered the Damen Residence. DSOF ¶ 46.

### C. Administrative Complaints

Based on Inspector Smith's and Inspector Kerksick's December 3 and 6, 2012, inspections, the City of Chicago issued two administrative complaints against Plaintiff dated January 4 and 10, 2013. DSOF ¶¶ 29, 48; 1/4/13 Notice of Violation [86-6] at 0032; 1/10/13 Notice of Violation [86-7] at 0005. At the top of the page in the header, these administrative notices both state: "**Case Group**[:] TARGET." 1/4/13 Notice of Violation [86-6] at 0032 (emphasis in original); 1/10/13 Notice of Violation [86-7] at 0005 (emphasis in original). This form header, which is similar to a case caption, appears on each document, and it is listed below the property address and the "**Dept of Buildings NOV #**" (the Department of Buildings notice of violation number). 1/4/13 Notice of Violation [86-6] at 0032 (emphasis in original); 1/10/13 Notice of Violation [86-7] at 0005 (emphasis in original).

Plaintiff remedied some of the housing violations and, on January 30 and June 21, 2013, respectively, the City of Chicago issued fines for $275 and $540. DSOF ¶¶ 32, 49; 1/30/13 Administrative Order [86-10] at 0002; 6/21/13 Administrative Order [86-9] at 0029.

III.    **Analysis**

Pursuant to 42 U.S.C. § 1983, Plaintiff alleges that the Inspectors and the City of Chicago violated the Fourth Amendment and Equal Protection Clause, respectively.  This Court analyzes each claim in turn, and grants Defendants' motion for summary judgment with respect to both Counts.

A.      **Fourth Amendment Claim**

Plaintiff argues that Defendants, in contravention of the Fourth Amendment's protection against unreasonable searches and seizures, entered his property and enforced the local building codes without any authority to do so.  It is undisputed that the inspections here are governed by the Fourth Amendment because they were conducted by government (City of Chicago) officers.

Administrative searches, such as the home inspection here, are subject to the Fourth Amendment's protections, and they must be conducted pursuant to a properly issued warrant or a warrant exception.  *Montville v. Lewis*, 87 F.3d 900, 902 (7th Cir. 1996); *Wilson v. Health & Hospital Corp. of Marion County*, 620 F.2d 1201, 1208 (7th Cir. 1980).  Warrantless searches are presumptively unreasonable, so the government typically bears the burden to show that the warrantless search was otherwise "reasonable" within the Fourth Amendment.  *Wilson*, 620 F.2d at 1208; *see also United States v. Place*, 462 U.S. 696, 699 (1983).

Consent to a search, however, can supply an exception to the search warrant requirement.  *United States v. Jackson*, 598 F.3d 340, 346 (7th Cir. 2010).  When conducting a consensual search, the government must not go beyond the scope of

the consent; otherwise, the search may become impermissible under the Fourth Amendment. *Id.* at 348. The government bears the burden to show that the consent exception applies by a preponderance of the evidence. *United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000).

Here, the parties dispute whether Lasley had the legal authority to consent to a search of the Damen Residence and, if she did have authority to consent, whether the scope of the inspections exceeded Lasley's consent. This Court addresses each issue in turn, and finds that Defendants have met their burden.

### 1. Lasley's Legal Authority to Give Consent

Plaintiff argues that Lasley lacked the legal authority to consent to the December 2012 inspections because she believed that Inspector Smith and Inspector Kerksick worked for a non-government entity ("3-1-1") and not the City of Chicago. Defendants respond that Lasley's misunderstanding does not vitiate her authority to consent, and the undisputed record confirms that neither Inspector Smith nor Inspector Kerksick ever actively concealed their status as a government employee.

A non-homeowner such as Lasley can consent to a government search of a home where she has actual or apparent authority to give that consent. *United States v. Ryerson*, 545 F.3d 483, 487, 489 (7th Cir. 2008). The government bears the burden of showing that the third-party possessed either actual or apparent authority over the premises or effects that were inspected. *United States v. Groves*, 470 F.3d 311, 318-19 (7th Cir. 2006).

Actual authority is based upon the "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *United States v. Matlock*, 415 U.S 164, 171 n.7 (1974); *see also United States v. James*, 571 F.3d 707, 714 (7th Cir. 2009); *Ryerson*, 545 F.3d at 487. The government need not have believed that the consenting co-habitant had an actual ownership interest in the home. *United States v. Goins*, 437 F.3d 644, 648 (7th Cir. 2006). The homeowner thus assumes the risk that a third-party may exercise actual or apparent authority over his home, including by permitting government agents to access the home. *Ryerson*, 545 F.3d at 488; *Basinski*, 226 F.3d at 834 (citing *Matlock*, 415 U.S. at 171 n.7).

Even if the non-owner lacks actual authority, she can give consent to a search of a property based on apparent authority. A government officer acts pursuant to apparent authority when the facts available to him at the time of the investigation "warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990); *see also United States v. Richards*, 741 F.3d 843, 850-51 (7th Cir. 2014). The Seventh Circuit has outlined 10 non-exhaustive factors that aid in determining whether a party had actual or apparent authority: (1) possession of a key to the premises; (2) a person's admission that she lives at the residence in question; (3) possession of a driver's license listing the residence as the driver's legal address; (4) receiving mail

and bills at that residence; (5) keeping clothing at the residence; (6) having one's children reside at that address; (7) keeping personal belongings at that residence; (8) performing household chores at the home; (9) being on the lease for the premises and/or paying rent; and (10) being allowed into the home when the owner is not present. *Groves*, 470 F.3d at 319.

As such, Lasley had authority to consent to the December 2012 inspections of the Damen Residence if the record confirms that she had joint control of or access to the Damen Residence (actual authority), or it was reasonable for Inspector Smith and Inspector Kerksick to believe Lasley had joint control of or access to the Damen Residence (apparent authority). *James*, 571 F.3d at 714.

Based on the undisputed factual record, Lasley had both actual and apparent authority to consent to the inspections. For example, in *Goins*, 437 F.3d at 645-46, 648-49, the Court denied a motion to suppress drugs and a gun found at the defendant's home, and the Seventh Circuit affirmed, finding that the "girlfriend" had actual and apparent authority to consent to the search. The police conducted the search after the girlfriend had called them, reporting that she had been abused by her defendant boyfriend and volunteering that her boyfriend kept drugs and a handgun in his home. *Id.* at 646. The girlfriend explained that while she technically lived in an apartment several miles away, she had been staying at her boyfriend's home on-and-off for several months. *Id.* The girlfriend further explained that she had a key to the apartment, performed household chores and had clothing and household items there. *Id.* at 646, 649.

The same result was reached in *Ryerson*. The district court also denied a motion to suppress, and the Seventh Circuit again affirmed, finding that the defendant's girlfriend had actual authority to consent to a police search of the defendant's home. 545 F.3d at 487-89. The defendant's girlfriend had stayed at the home for 10 months with their child, and while the girlfriend no longer resided at the home, she still maintained personal belongings there. *Id.* at 488. The Court characterized the girlfriend's stay at the home as a "significant period of time." *Ryerson*, 545 F.3d at 487; *see also United States v. Denberg*, 212 F.3d 987, 989, 991-92 (7th Cir. 2000) (finding that the defendant's girlfriend had actual authority to consent to a search of the defendant's home because, among other reasons, she had been staying with the defendant for eight months at the time of the search).

As in those three cases, the undisputed facts here establish that Lasley had actual authority to consent to the December 2012 inspections of the Damen Residence. Like the girlfriends in *Denberg*, *Goins* and *Ryerson*, Lasley lived full-time with Plaintiff in December 2012, when the inspections occurred, and had been living with him off-and-on for at least three years. DSOF ¶¶ 8-9; Lasley Dep. at 11, 47-48. That is a significant period of time. *See Ryerson*, 545 F.3d at 487. Many of the non-exhaustive *Groves* factors also are met here: Lasley had a key to the Damen Residence, kept her clothes there, had friends and relatives regularly visit her at the home, contributed to household expenses and had full access to all the rooms in the home. DSOF ¶¶ 10-14. On these facts, Plaintiff assumed the risk that Lasley

might consent to a search of the Damen Residence, and she had the actual authority to do so.

Even if Lasley lacked actual authority, Lasley also possessed the apparent authority to consent to the searches from Inspector Smith and Inspector Kerksick. On December 3, 2012, Inspector Smith came to the Damen Residence in response to a 3-1-1 call, Lasley answered the door, Inspector Smith asked Lasley if she lived at the home and Lasley answered yes. DSOF ¶¶ 21-22; Lasley Dep. at 26. Inspector Smith was responding to a 3-1-1 call, and Lasley's dialogue with Inspector Smith confirmed that Lasley understood that a 3-1-1 call had been placed. DSOF ¶ 20; Lasley Dep. at 13, 17. Likewise, three days later, on December 6, Inspector Kerksick came to the Damen Residence for a follow-up inspection, and Lasley again consented. DSOF ¶¶ 33, 37, 42; Lasley Dep. at 15. Inspector Kerksick may not have known that Lasley was the same person who allowed Inspector Smith into the Damen Residence, but, as the follow-up inspector to a prior 3-1-1 call for government assistance, it was reasonable for Inspector Smith and Inspector Kerksick to believe, under the circumstances here, that Lasley could and did give valid consent to inspect the Damen Residence.

This case once again mirrors *Ryerson*, 545 F.3d at 489-90, where the Seventh Circuit found that the police conducted a valid search of the defendant's garage pursuant to the defendant's girlfriend's apparent authority. The Seventh Circuit emphasized that, on a prior occasion, the girlfriend had guided the officers through the home where the officers observed the girlfriend's personal belongings. *Id.* at

489. In the same way that Inspector Smith's initial inspection supports Inspector Kerksick's follow-up inspection, the prior facts from the first search in *Ryerson* supplied a reasonable basis for the police to believe that the girlfriend could consent to a second search, this time of the home's garage. *Id.* at 489-50.

Plaintiff also asserts that Lasley's consent was involuntary because she was supposedly coerced into providing consent to the Inspectors. Addressing Inspector Smith first, Plaintiff argues that the questions Inspector Smith asked Lasley before entering the Damen Residence were "irrelevant" and coercive. PSOAF at 2. At her deposition, however, Lasley summarized the innocuous discussion she had with Inspector Smith before Inspector Smith entered the Damen Residence:

> She [Inspector Smith] told me she wanted to see was my window actually fixed, because the board was still up there. And I told her it was fixed. You know what I'm saying? I really wanted to ask why I had to prove it to her, but I went and let the lady come on in and see the window was fixed.

Lasley Dep. at 19. Based upon the record, this Court finds no genuine issue of fact as to the issue of consent. *Richards*, 741 F.3d at 848; *United States v. Grap*, 403 F.3d 439, 443 (7th Cir. 2005) (finding that the voluntariness of consent remains a question of fact that depends on the totality of the circumstances); *Valance v. Wisel*, 110 F.3d 1269, 1278-79 (7th Cir. 1997) (finding that the plaintiff bears the ultimate burden of proof on this issue).

Likewise, as to Inspector Kerksick, Plaintiff has cited no evidence demonstrating a genuine issue of fact regarding coercion. Even though Lasley claims that she "had to" let Inspector Smith into the Damen Residence "to show

them everything on that paper to make sure it was approved," Lasley Dep. at 45, her conclusory statement that she felt that she "had" to let Inspector Kerksick into the residence finds no basis in fact, and there is no evidentiary support in the record to show that her belief was the result of some coercive comments or actions by Inspector Kerksick or Inspector Smith.

Indeed, Plaintiff points to no such evidence in the record, despite his complaints that the Inspectors never offered to show any identification. Here, there is no evidence of fraud or pretext, as the Inspectors never denied being City employees in response to any question by Lasley; and the mere omission by Inspector Smith and Inspector Kerksick to show identification (when never asked to do so) fails to put the question of coercion at issue. Lasley may not have personally understood that City employees responded to 3-1-1 calls, DSOF ¶ 20; Lasley Dep. at 14-15, but that does not mean that the Inspectors actively misled her or that her consent became invalid.

Ultimately, Inspector Smith and Inspector Kerksick acted within the parameters set forth by Seventh Circuit law, because the record confirms that Lasley gave her valid consent to Inspector Smith and Inspector Kerksick.

### 2. Scope of Consent

Having determined that Lasley gave valid consent, this Court now addresses whether Defendants' inspections went beyond the scope of Lasley's consent. Plaintiff argues that Inspector Smith and Inspector Kerksick represented that they intended to inspect only certain specified items, and received limited consent to

search those items. Plaintiff argues that Defendants, however, misused that limited consent as a license to conduct a general exploratory search. The Court finds that no basis to reach Plaintiff's conclusion in the factual record.

The scope of consent is limited by the breadth of actual consent, and whether the search remained within the boundaries of the consent is determined from the totality of the circumstances. *Jackson*, 598 F.3d at 348. The standard for measuring the scope of consent is that of "objective reasonableness," that is, what would the typical reasonable person have understood by the exchange between the government official and the person giving consent. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991); *Jackson*, 598 F.3d at 348. Moreover, even if an official is operating outside of the scope of consent, "the plain-view doctrine allows for seizure of material if: (1) a law-enforcement officer is lawfully present; (2) an item not named in the warrant (or, likewise, outside the scope of consent) is in the plain view of the officer; and (3) the incriminating nature of the item is immediately apparent." *United States v. Raney*, 342 F.3d 551, 558-59 (7th Cir. 2003). Finally, an individual's consent remains valid until withdrawn. *Jackson*, 598 F.3d at 347.

In *United States v. Saucedo*, 688 F.3d 863, 864 (7th. Cir. 2012), the defendant was the driver of a tractor-trailer that was stopped by a state trooper because the license plate appeared to be expired. After the trooper confirmed that the plate was expired, the trooper alerted the defendant that he also was going to conduct a motor carrier safety inspection. *Id.* The driver handed over his license, which the trooper ran and learned was invalid. *Id.* The trooper also learned that the driver had a

criminal record, and the trooper thus asked the driver if he could search his truck and trailer. *Id.* The driver answered: "yes." *Id.* After searching the trailer, which was empty, the trooper moved to the tractor. *Id.* During the search of the tractor, the trooper used a screwdriver to disassemble a small compartment, pulled back the plastic molding inside the compartment and found a hidden compartment containing drugs. *Id.* at 864-65.

The driver objected to this search, arguing that the trooper exceeded the scope of the driver's general consent by using a flashlight and screwdriver to remove screws holding the molding in place that covered a hidden compartment in the tractor. *Id.* at 865. The Seventh Circuit disagreed, finding that the driver consented to a search without any express limitation, and that a reasonable person would have understood that the driver consented to a search that encompassed the conduct of the trooper. *Id.* at 864, 866. The Court thus affirmed the district court's denial of the driver's motion to suppress.

As in *Saucedo*, Inspector Smith and Inspector Kerksick did not exceed the scope of Lasley's consent, nor did Lasley impose any express limitations on her consent. In both instances, Lasley knew, before letting the Inspectors into the Damen Residence, that they intended to examine the window in response to a 3-1-1 call (Inspector Smith) and to assess the condition of the furnace (Inspector Kerksick).

With regard to Inspector Smith specifically, Plaintiff argues that Inspector Smith conducted a general search, starting on the outside of Plaintiff's house and

continuing from the basement through the house and upstairs to Plaintiff's bedroom. PSOAF at 11. The factual record, however, provides no support for Plaintiff's claims.

Instead, the undisputed facts show a proper consensual encounter. Lasley authorized Inspector Smith to come inside the Damen Residence so that Inspector Smith could answer the 3-1-1 call. Lasley Dep. at 16-17. After inspecting the window, Inspector Smith asked to use and received permission to use the bathroom, which was located in the basement. DSOF ¶ 23. When asked if Inspector Smith could use the bathroom, Lasley stated "Yeah, I told her to go downstairs." Lasley Dep. at 20. After returning from the basement, Inspector Smith asked what was wrong with the furnace (which had cut off), and Lasley replied, "[I]t do that, cut off." DSOF ¶¶ 24-25; Lasley Dep. at 14. Given the location of the bathroom, viewing the furnace remained within the scope of Lasley's consent, and in any event, since Inspector Smith was lawfully present in the basement when it cut off, the observations remain proper under the plain view doctrine. *See Raney*, 342 F.3d at 558-59. Inspector Smith and Lasley then engaged in a discussion of various assistance programs. DSOF ¶ 25; Lasley Dep. at 15, 22. When asked by Lasley to leave, Inspector Smith left promptly. DSOF ¶ 27; Lasley Dep. at 37-38.

Turning now to Inspector Kerksick, Plaintiff argues that Inspector Kerksick came to the Damen Residence to assess an inoperable furnace and instead conducted a general home inspection. PSOAF at 10. The undisputed facts show, however, that the scope of Lasley's consent was not exceeded. On December 6,

2012, Inspector Kerksick came to follow-up on the housing violations found by Inspector Smith. DSOF ¶ 41. Again, Lasley let the Inspector into the Damen Residence and, regardless of whether or not Inspector Kerksick is the unidentified African-American man referenced by Lasley, Lasley allowed him (or them) to look at all three doors in the home, the walls and inside the drawers for cockroaches. DSOF ¶¶ 42-43; Lasley Dep. at 45, 54-56.

Neither inspector exceeded the scope of Lasley's consent. Lasley did not expressly limit her consent or the parameters of the Inspectors' searches in any way. Again, under the objective reasonableness test, a reasonable person would have understood the exchange between the inspectors and Lasley as permitting the conduct of the Inspectors. *Jimeno*, 500 U.S. at 251.

For these reasons, Defendants did not exceed Lasley's consent and, thus, Plaintiff's Fourth Amendment claim fails.

## B.    Equal Protection Claim

Plaintiff also brings an equal protection claim against Defendant City of Chicago only, arguing that the December 2012 inspections were part of a policy or practice of targeting African American building owners for inspections because of the owner's race. This claim also fails.

Under the Equal Protection Clause of the Fourteenth Amendment, no state shall deny to any person within its jurisdiction the "equal protection of the laws." An equal protection violation typically occurs when a regulation draws distinctions among people based on a person's membership in a suspect class, such as race.

*Srail v. Village of Lisle, Illinois*, 588 F.3d 940, 943 (7th Cir. 2009). To establish an equal protection violation, Plaintiff must show that the City of Chicago's conduct: (1) had a discriminatory effect; and (2) was motivated by a discriminatory purpose. *Chavez v. Illinois State Police*, 251 F.3d 612, 635-36 (7th Cir. 2001). This Court addresses each element in turn, and finds that Plaintiff has satisfied neither.

### 1.  Discriminatory Effect

To prove discriminatory effect, Plaintiff must demonstrate that he: (1) is a member of a protected class; (2) is similarly situated to members of the unprotected class; and (3) was treated differently from members of the unprotected class. *Chavez*, 251 F.3d at 636. Under the third element, Plaintiff must show that he was treated differently from members of the unprotected class, which he may do by naming such individuals or by employing statistics. *Id.* at 636. In certain cases, the Supreme Court has highlighted the importance of statistical analysis when the existence of discrimination is a "disputed issue." *Chavez*, 251 F.3d at 637-38 (citing *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 339 (1977)).

Here, under the third element, Plaintiff has not named any similarly situated individuals or undertaken any statistical analysis of the City of Chicago's inspections. Indeed, Plaintiff concedes as much. At his deposition, Plaintiff was asked if he knew of any specific white homeowners that had been treated differently than he, and he answered: "No, no, I don't." Rutledge Dep. at 141. Consistent with that testimony, when asked in an Interrogatory to identify "any person [Plaintiff] will call at trial or whose statement [he] will use in any way to support [his] claims

in this lawsuit," Plaintiff answered: "None."  DSOF ¶ 53; Plaintiff's Response [86-11] to Interrogatory No. 13.  Likewise, when asked to identify any expert to support his equal protection claim, Plaintiff again answered: "None."  DSOF ¶ 54; Plaintiff's Response [86-11] to Interrogatory No. 14.

Instead, Plaintiff merely relies on the face of the two administrative Notice of Violations filed against him by the City of Chicago.  Specifically, Plaintiff attempts to infer that these Notices singled him out by race because they include the following words in the caption: "**Case Group**[:] TARGET."  1/4/13 Notice of Violation [86-6] at 0032 (emphasis in original); 1/10/13 Notice of Violation [86-7] at 0005 (emphasis in original).  Plaintiff has marshalled no evidence, however, supporting any discriminatory inference from the form language "**Case Group**[:] TARGET" in the Notice of Violations.  As Plaintiff himself acknowledges, "**Case Group**[:] TARGET" could have just been referring to properties that were linked with particular illicit activities (*e.g.*, gang violence or drugs) or were thought to be abandoned.  Rutledge Dep. at 82-84.

Any inference Plaintiff could hope to draw from the words "**Case Group**[:] TARGET" also is undermined by the fact that Lasley never revealed Plaintiff's race during the inspections.  DSOF ¶¶ 29, 50-51; Lasley Dep. at 26.  In sum, even when viewing the evidence in the light most favorable to the Plaintiff, as this Court must do at summary judgment, no genuine issue of material fact arises from the words "**Case Group**[:] TARGET" alone.

Last, Plaintiff argues that the City of Chicago requires its inspectors to identify themselves as City inspectors when inspecting white—but not black—homes. PSOAF at 7. That allegation, however, lacks any factual support in the record and thus cannot defeat a motion for summary judgment.

Without factual evidence to support Plaintiff's claim, summary judgment for the City of Chicago is warranted.

## 2. Discriminatory Purpose

Even if Plaintiff could show any discriminatory effect, his equal protection claim still fails based upon the record before the Court. To satisfy the second element of the equal protection test, Plaintiff must show that Defendants' actions were motivated by a discriminatory purpose. Discriminatory purpose means that the City of Chicago selected or reaffirmed a particular course of action at least in part because of—and not merely in spite of—its adverse effects upon an identifiable group. *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 258 (1979); *Locke v. Haessig*, 788 F.3d 662, 669 (7th Cir. 2015); *United States v. Board of School Commissioners of City of Indianapolis, Indiana*, 637 F.2d 1101, 1119 (7th Cir. 1980). Discriminatory purpose thus need not be the dominant or primary motivating force of the act in question, and foreseeable consequences alone do not establish a constitutional violation. *Board of School Commissioners*, 637 F.2d at 1119.

Here, as discussed above, Plaintiff has failed to show any facts indicating that the City of Chicago acted with any discriminatory purpose. Plaintiff has

propounded no evidence, despite his obligation to do so at summary judgment, *Johnson v. Cambridge Industries, Inc.*, 325 F.3d 892, 901 (7th Cir. 2003), showing that the City of Chicago has a policy or practice of targeting African-American building owners for inspections because of the owner's race. Plaintiff has not pointed to any similarly situated Caucasian homeowners who have been treated more favorably than him. Plaintiff has not shown that Notice of Violations sent to such homeowners do not include the language "**Case Group**[:] TARGET." Plaintiff has failed to cite any statistical evidence, or to name any person or expert witness, that can factually support his claim at trial. Plaintiff's equal protection claim thus fails. *See Sow v. Fortville Police Department*, 636 F.3d 293, 303 (7th Cir. 2011) (affirming summary judgment where no evidence showed discriminatory purpose).

## IV.    Conclusion

Defendants' Motion for Summary Judgment [84] is granted. The September 10, 2015 status hearing is stricken; the parties need not appear then. Civil case terminated.

Dated: September 1, 2015

Entered:

_____
John Robert Blakey
United States District Judge